# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID W. COLE, an individual; and SILVER SANDS CONSULTING, LLC, a Utah limited liability company,<br><br>      Plaintiffs,<br><br>vs.<br><br>SALT CREEK, INC., a Utah corporation; and INVE ASIA LIMITED, a foreign corporation, SALT CREEK HOLDINGS, LLC, a Utah limited liability company, NUTRIAD INC. F/K/A BFI INNOVATIONS, INC., a foreign corporation, INVE AMERICAS SERVICES, INC., a foreign corporation, INVE AQUACULTURE, INC., a Utah corporation, INVE, BV, a foreign corporation, INVE TECHNOLOGIES, NV, a foreign corporation, OCEAN NUTRITION ASIA CO., LTD. D/B/A AQUA PETS AMERICA, a foreign corporation, and JOHN DOES 1 THROUGH 10,<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>**DENYING COLE'S<br>    [243] MOTION TO ALTER OR<br>    AMEND JUDGMENT, OR IN THE<br>    ALTERNATIVE, FOR NEW<br>    TRIAL ON THE ISSUES OF<br>    BREACH OF CONTRACT AND<br>    DAMAGES and<br>GRANTING SALT CREEK'S<br>    [242] RENEWED MOTION FOR<br>    JUDGMENT AS A MATTER OF<br>    LAW, and<br>GRANTING IN PART SALT CREEK'S<br>    [234] MOTION FOR ATTORNEYS'<br>    FEES**<br><br>   Civil No. 2:08-cv-928-DN<br><br>   District Judge David Nuffer |

This case was tried before a jury in January 2013. After trial, both Defendant Salt Creek, Inc. ("Salt Creek") and Plaintiffs David W. Cole ("Cole") and Silver Sands Consulting, LLC (collectively "Plaintiffs") filed motions related to the jury's verdict. Salt Creek filed a Motion for Award of Attorneys' Fees and Costs ("Fee Motion")[1] and a Renewed Motion for Judgment as a Matter of Law ("JNOV Motion").[2] Plaintiffs filed a Motion to Alter or Amend Judgment, or in the Alternative, for New Trial on the Issues of Breach of Contract and Damages ("Plaintiffs'

---

[1] Docket no. 234, filed January 31, 2013.

[2] Docket no. 242, filed February 14, 2013.

Motion").[3] For the reasons set forth herein, Plaintiffs' Motion is DENIED, Salt Creek's JNOV

Motion is GRANTED, and Salt Creek's Fee Motion is GRANTED IN PART.

## CONTENTS

BACKGROUND ......................................................................................................... 2
DISCUSSION .......................................................................................................... 6
    I.    Plaintiffs' Motion to Alter or Amend Judgment, or for New Trial. .................................. 6
    II.   Salt Creek's Renewed Motion for Directed Verdict. ....................................... 12
        A.   Indigne Did Not Have Actual Authority. ............................................... 13
        B.   Indigne Lacked Apparent Authority to Act on Behalf of Salt Creek. ....................... 15
        C.   The Bonus Agreement was Never Ratified and Salt Creek was Not the Sole
            Beneficiary of It. ................................................................. 16
        D.   The Integration Clause in the Employment Contract Preempts Salt Creek's  Liability
            Under the Bonus Agreement. ........................................................ 17
    III.  Salt Creek's Motion for Attorneys' Fees. ...................................................... 18
        A.   401(k) Contract Claim Fails. .......................................................... 19
        B.   Entitlement to Attorneys' Fees. ........................................................ 21
        C.   Amount of Award. ................................................................... 22
ORDER ................................................................................................................ 24

## BACKGROUND

Plaintiff David Cole was a founder and the former president of Salt Creek. In 2002, Cole

and the other shareholders of Salt Creek negotiated the sale of the company to Salt Creek

Holdings, Inc.,[4] an entity affiliated with a group of companies known as INVE (the "INVE

Group"). Mr. Frank Indigne ("Indigne") negotiated the sale with Cole and Salt Creek.

In August 2002, prior to the INVE Group's acquisition of Salt Creek, Cole and Indigne

reached an agreement (the "Bonus Agreement") that Cole would receive monthly bonus

payments of $21,000 (the "Bonus Payments"). The only document evidencing this agreement

was an unsigned "Proposal to Dave Cole," which set forth Cole's responsibilities. Cole would be

"responsible for all the Artemia business through the distribution channels (all non INVE

brands)" and "responsible for all the pet business within the Inve group under Ocean Nutrition

---

[3] [Docket no. 243](#), filed February 15, 2013.

[4] Trial Exhibit 33, Unanimous Written Consent of Board of Directors of the Sole Shareholder of Salt Creek, Inc.

organization."[5] In exchange, the document states, "remuneration will be based on a fixed part of 150 k$ [sic] and a yearly bonus of min. 250k $ till [sic] a max of 500k $ [sic] based on results."[6] Cole testified that he and Indigne signed the Bonus Agreement, but the signed copy was not introduced at trial. The Bonus Agreement was kept secret from Salt Creek, and remained a secret from certain officers of Salt Creek until 2008.

The INVE Group purchased Salt Creek on September 26, 2002.[7] On that same date, Cole signed an employment agreement with Salt Creek. The term of Cole's employment was to be for one year, with an annual salary of $150,000. The employment agreement was signed on behalf of Salt Creek by Peter Erickson; on behalf of the INVE Group by Emiel de Becker; and by Cole.[8] The employment agreement contained an integration clause, which stated that the employment agreement "contains the entire employment agreement of the parties and there are no other promises or conditions in any other employment agreements whether oral or written."[9] It also stated that the employment agreement "supersedes any prior written or oral employment agreements between the parties."[10]

After the INVE Group acquired Salt Creek, Cole continued to be employed there. Cole received an annual salary of $150,000 paid to him by Salt Creek, and between November 2002 and April 2006, Plaintiff Silver Sands Consulting, LLC, Cole's company, received monthly $21,000 payments from INVE Asia, Ltd., an affiliate of the INVE Group, for an "Asian

---

[5] Proposal to Dave Cole, docket no. 242-1, filed February 14, 2013.

[6] *Id.*

[7] Transcript at 143:13 – 20, docket no. 238, filed February 5, 2013.

[8] Employment Agreement, docket no. 242-2, filed February 14, 2013.

[9] *Id.*

[10] *Id.*

consulting fee." After April 2006, the Bonus Payments were only intermittently made, and were often not for the full $21,000 amount. Salt Creek never made any Bonus Payments.

In 2008, Indigne lost control of the INVE Group due to financial troubles, and much of the business was taken over by the INVE Group's lenders. In October 2008, Cole's employment with Salt Creek was terminated, and on November 20, 2008, Plaintiffs brought suit against Salt Creek and INVE Asia, Ltd. asserting claims for breach of contract and breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA").[11] Plaintiffs' breach of contract claims arose (i) out of Salt Creek's alleged breach of the employment agreement by preventing Cole from participating in Salt Creek's 401(k) plan, and (ii) out of an alleged breach of the Bonus Agreement because Plaintiffs did not receive all the Bonus Payments. On August 5, 2010, Plaintiffs amended their complaint to name additional affiliates of the INVE Group as defendants and to assert an alter ego cause of action against all of the Defendants. These additional defendants were dismissed prior to trial.

### Motions in Limine Excluding Evidence

Plaintiffs' case was set to be tried before a jury in January 2013. Prior to trial, Plaintiffs filed a motion in limine to exclude all evidence related to the purchase price paid to Cole and the other owners of Salt Creek when Salt Creek was sold to the INVE Group (the "Purchase Price").[12] Plaintiffs' motion in limine was granted because the Purchase Price was irrelevant and presented a substantial risk of unfair prejudice and confusion.[13]

---

[11] 29 U.S.C. § 1001 *et seq*.

[12] Motion in Limine to Exclude Evidence of Purchase Price of Salt Creek Sale, docket no. 165, filed December 14, 2012.

[13] Docket Text Order, docket no. 194, entered December 31, 2012.

Also prior to trial, Salt Creek filed a motion in limine to exclude evidence and testimony related to Cole's breach of contract claim related to his participation in Salt Creek's 401(k) plan.[14] This motion was granted on January 3, 2012.[15]

### Issues and Parties at Trial

At the time of trial, the only remaining defendant was Salt Creek. At the close of Plaintiffs' case in chief, Salt Creek moved for judgment as a matter of law.[16] The basis for Salt Creek's motion was that Indigne lacked any authority to enter into the Bonus Agreement on behalf of Salt Creek, and that even if he did, the integration clause of Cole's employment agreement nullified the Bonus Agreement. Salt Creek's motion was taken under advisement.

### Inadvertent Display of Exhibit

During Salt Creek's closing argument, counsel for Salt Creek displayed an unredacted exhibit which showed the Purchase Price.[17] Plaintiffs' counsel immediately indicated that the exhibit was not redacted, and it was quickly removed from the screen. Outside the presence of the jury, Plaintiffs' counsel objected to the display of the unredacted exhibit. The court noted that it was only shown for a brief time, and that the print was relatively fine. No further discussion ensued.

### After the Verdict

The jury found that Cole and Salt Creek entered into the Bonus Agreement; that Salt Creek did not prove that the payment amount under the Bonus Agreement had been modified;

---

[14] Salt Creek, Inc.'s Motion in Limine to Exclude Evidence and Testimony by Plaintiffs of Any Breach of Contract Relating to Cole's Participation in the ERISA Plan, docket no. 170, filed under seal December 14, 2012.

[15] Sealed Minute Order, docket no. 203, entered January 3, 2013.

[16] Salt Creek, Inc.'s Motion for Judgment as a Matter of Law, docket no. 217, filed January 15, 2013.

[17] Transcript at 505:4-8, docket no. 239, filed February 8, 2013.

and that Plaintiffs proved that Cole performed his obligations under the Bonus Agreement.[18] The jury also found that Plaintiffs failed to prove that Salt Creek breached the contract by failing to make the Bonus Payments.[19]

In response to the verdict, Plaintiffs filed a Motion to Alter or Amend Judgment, or in the Alternative, for New Trial on the Issues of Breach of Contract and Damages.[20] Salt Creek filed its Fee Motion[21] seeking to recover fees incurred in defending Plaintiffs' breach of contract claim arising from the 401(k) participation, and Salt Creek renewed its motion for judgment as a matter of law (the "JNOV Motion").[22] Although Salt Creek states that it filed its JNOV Motion under Fed.R.Civ.P. 50(a), it will be treated as a motion for judgment non obstante veredicto under Fed.R.Civ.P. 50(b). Each of these motions is discussed below.

## DISCUSSION

### I.     Plaintiffs' Motion to Alter or Amend Judgment, or for New Trial.

"A Rule 59(e) motion to alter or amend the judgment should be granted only to correct manifest errors of law or to present newly discovered evidence."[23] The trial court must not abuse its discretion when determining whether to grant or deny a Rule 59(e) motion.[24]

Plaintiffs contend that the jury's verdict was contrary to the clear weight of the evidence and that the only explanation is the inadvertent display of the Purchase Price during closing argument. Plaintiffs posit that Cole presented unrebutted testimony at trial regarding the terms of the Bonus Agreement and that the jury's finding that neither party breached the Bonus

---

[18] Verdict Form, docket no. 226, entered January 17, 2013.

[19] *Id.*

[20] Docket no. 243, filed February 15, 2013.

[21] Docket no. 234, filed January 31, 2013.

[22] Docket no. 242, filed February 14, 2013.

[23] *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997) (internal quotation marks and citations omitted).

[24] *See id.*

Agreement was an impossibility. Plaintiffs contend that display of the Purchase Price must have affected the jury's deliberations. How else could the jury find that even though Cole had a contract with Salt Creek, the contract was not breached when the $21,000 monthly bonus payments stopped? Relying on Fed.R.Evid. 606(b), Plaintiffs submit the Declaration of Juror No. 11 to establish that at least some of the jurors saw the Purchase Price during closing argument and that it was discussed during deliberations. Plaintiffs argue that they were prejudiced by the display of the Purchase Price, which the order granting their motion in limine prohibited.[25]

Salt Creek argues that the jury did not have to accept all of Cole's testimony and was free to reach its own decisions about the evidence and testimony at trial. Salt Creek also argues that the jury found that the Bonus Agreement had no definite term. Finally, Salt Creek argues that the deliberative process of the jury should not be invaded because Plaintiffs never requested a curative instruction, failed to prove that the jury would be unable to follow the general instructions regarding evidence, and failed to show that display of the Purchase Price was prejudicial to Plaintiffs.

Plaintiffs' Motion is denied for several reasons. First, the evidence and testimony at trial was not as one-sided or as clear as Plaintiffs argue. Plaintiffs' Motion and reply memorandum[26] cite to various portions of the trial transcript in support of their arguments, but in many cases, the cited testimony does not stand for the proposition for which it is cited. For example, Plaintiffs repeatedly claim that Cole testified at trial that Indigne negotiated and performed other acts on behalf of Salt Creek, such as the negotiation and execution of the Bonus Agreement.[27] But none

---

[25] Docket Text Order granting [165] Motion in Limine to Exclude Evidence of Purchase Price of Salt Creek Sale, docket no. 194, entered December 31, 2012.

[26] Reply in Support of Motion to Alter or Amend Judgment, or in the Alternative, for New Trial on the Issues of Breach of Contract and Damages, docket no. 257, filed April 4, 2013.

[27] Plaintiffs' Motion at vi, ¶ 8; vii, ¶ 14, docket no. 243, filed February 15, 2013.

of the portions of the transcript cited by Plaintiffs show that Indigne did these acts *on behalf of Salt Creek.*[28]

Second, Plaintiffs ignore the role of the jury in hearing testimony and weighing the evidence. It is within the province of the jury to disregard testimony if they believe it to be incredible or inconsistent with other evidence presented at trial.

Third, the verdict is not contrary to the clear weight of the evidence. There was no dispute at trial that Cole stopped receiving the Bonus Payments. Because the jury found that the Bonus Agreement was between Salt Creek and Cole, that it was unmodified, and that Cole performed or was excused from performing his obligations under it, Plaintiffs argue that Salt Creek *must* have breached it when the Bonus Payments stopped. But this is a leap of logic that ignores many other possibilities for the jury's decision. In weighing the evidence and the credibility of the witnesses, the jury could have concluded that Plaintiffs did not meet their burden to show that Salt Creek had a continuing obligation to make the Bonus Payments. Or the jury could have concluded that Cole stopped performing services for Salt Creek and the INVE Group (because they were no longer needed, not because he committed a breach) and was thus no longer entitled to the Bonus Payments. These are just two of the possible explanations behind the jury's verdict. There are many potentially decisive issues between Cole's performance and an alleged breach by Salt Creek. The verdict is not *per se* against the clear weight of the evidence.[29] The jury's deliberations will not be invaded in an effort to determine the exact rationale behind

---

[29] To Plaintiffs' claims of prejudice from display of the Purchase Price, the verdict is not indicative of prejudice. Had the jury been influenced by the Purchase Price, one would expect that the jury would have found that Salt Creek breached the Bonus Agreement, but then awarded Plaintiffs no damages. Instead, the jury found that Salt Creek did not breach the Bonus Agreement.

its decision just because Plaintiffs believe the verdict to be "inexplicable"[30] and inconsistent with their view of the case.

## Declaration of Juror No. 11 and Fed. R. Evid. 606(b)

In an effort to bolster their argument that the verdict was against the clear weight of the evidence, Plaintiffs submitted the Declaration of Juror No. 11 to demonstrate that at least some jurors saw the Purchase Price during closing argument and later discussed it during deliberations. According to Plaintiffs, this had a prejudicial effect on the deliberations and is *the* explanation behind the jury's verdict.

Rule 606(b) of the Federal Rules of Evidence prohibits juror testimony "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."[31] "The court *may not* receive a juror's affidavit or evidence of a juror's statement on these matters."[32] However, exceptions to this general rule provide that jurors may testify about whether "extraneous prejudicial information was improperly brought to the jury's attention;"[33] "an outside influence was improperly brought to bear on any juror;"[34] or "a mistake was made in entering the verdict on the verdict form."[35]

"When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for new trial, the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were

---

[30] Plaintiffs' Motion at iv, docket no. 243.

[31] Fed.R.Evid. 606(b)(1).

[32] *Id.* (emphasis added).

[33] Fed.R.Evid. 606(b)(2)(A).

[34] Fed.R.Evid. 606(b)(2)(B).

[35] Fed.R.Evid. 606(b)(2)(C).

permitted to testify as to what happened in the jury room."[36] This choice should be made with a mind toward the role of juries in our judicial system. "Jury decision-making is designed to be a black box: the inputs (evidence and argument) are carefully regulated by law and the output (the verdict) is publicly announced, but the inner workings and deliberation of the jury are deliberately insulated from subsequent review."[37] "If what went on in the jury room were judicially reviewable for reasonableness or fairness, trials would no longer truly be by jury … [but instead] [f]inal authority would be exercised by whomever is empowered to decide whether the jury's decision was reasonable enough, or based on proper considerations."[38]

Plaintiffs argue that Juror No. 11's testimony should be considered because the Purchase Price was extraneous prejudicial information that was observed by jurors and discussed during deliberations. This argument hinges on whether the Purchase Price, which was deemed inadmissible prior to trial but inadvertently displayed during closing argument, is "extraneous information."

Extraneous information includes "specific extra-record facts relating to the [case]."[39] "[E]xceptions for extraneous influences cover *misconduct* such as jurors reading news reports about the case, jurors communicating with third parties, bribes, and jury tampering."[40] "If a juror were to conduct his own investigation and bring the results into the jury room, as the Henry

---

[36] *United States v. Benally*, 546 F.3d 1230, 1232-33 (10th Cir. 2008) (quoting *McDonald v. Pless*, 238 U.S. 264, 267 (1915)).

[37] *Id*. at 1233.

[38] *Id*.

[39] *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1223 (10th Cir. 2005) (citing 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 606.03(1)(b) (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2004)) (emphasis removed).

[40] *Benally,* 546 F.3d at 1236 (emphasis added) (citations omitted).

Fonda character does in *Twelve Angry Men*, that behavior would constitute extraneous information, and Rule 606(b) would allow another juror to expose it."[41]

In *Bradford v. City of Los Angeles*,[42] from the Ninth Circuit, the trial court had instructed the jury to disregard certain portions of Bradford's testimony. After the jury returned a verdict in favor of Bradford, one of the police officer defendants, Sirk, moved for a new trial based on jury misconduct. Sirk submitted affidavits from several jurors demonstrating that the jury considered Bradford's stricken testimony in their deliberations. Sirk contended that consideration of the stricken testimony constituted extraneous prejudicial information under Rule 606(b). The Ninth Circuit affirmed the trial court's refusal to consider the stricken testimony as extraneous prejudicial information. It noted that Sirk "cite[d] no case, nor could he, that has found such consideration to constitute 'extraneous' information."[43] It further held:

> Rule 606(b) makes testimony about the *existence* of any extraneous prejudicial information admissible to prove juror misconduct. But testimony about how such information *affected* the deliberative process is not admissible. Whenever a judge instructs a jury to disregard testimony, the *existence* of that testimony is self-evident, since all of the jurors will have been present when the testimony was given. Therefore, the only use that affidavits could serve would be to demonstrate that this information *affected* the deliberative process. This is precisely what is protected by [R]ule 606(b).[44]

As in *Bradford*, there are two reasons the Declaration of Juror No. 11 cannot be considered. First, the jurors did not acquire or consider extra-judicial facts that were outside the control of and unknown to the court during trial. Display of the Purchase Price was not an extra-judicial fact. Both the court and counsel for the parties recognized the inadvertent display of the

---

[41] *Benally*, 546 F.3d at 1237.

[42] 21 F.3d 1111 (9th Cir. 1994) (unpublished).

[43] *Id*. at *6.

[44] *Id.* (citations omitted); *see also United States v. Davis*, 60 F.3d 1479, 1483 (10th Cir. 1995) ("[T]he dichotomy established by Rule 606(b) permits a juror to testify (either literally or by way of affidavit) on the question of whether any extraneous prejudicial information was improperly brought to bear upon a juror … but a juror may not testify as to the effect the outside information had upon the juror.") (internal quotation marks and citations omitted).

Purchase Price at the time it occurred, and the exhibit displaying the Purchase Price was immediately removed. The Purchase Price is not extraneous information.

Further, the Declaration of Juror No. 11[45] attempts to present evidence that this information *affected* the deliberative process. This is prohibited by Rule 606(b). Because Juror No. 11's testimony will not be considered, the Declaration of Adam Petersen[46] offered by Salt Creek in opposition will also not be considered. Plaintiffs' Motion is denied.

## II.    Salt Creek's Renewed Motion for Directed Verdict.

Motions for judgment non obstante veredicto, or JNOV, are evaluated under the same standard as a motion for directed verdict.[47] When reviewing a motion for JNOV, the evidence and inferences should be construed most favorably to the nonmoving party.[48] A motion for JNOV should only be granted "if the evidence points but one way and is susceptible to no reasonable inferences supporting the opposing party."[49]

After trial, Salt Creek filed its JNOV Motion,[50] renewing its motion for judgment as a matter of law in the event Plaintiffs filed any post-trial motions that could affect the jury's verdict in favor of Salt Creek.[51] Notwithstanding the unanimous jury verdict in favor of Salt Creek and denial of Plaintiffs' Motion, Salt Creek's JNOV Motion is now granted because there was no competent evidence that Indigne had authority to contract on behalf of Salt Creek in August

---

[45] Docket no. 245, filed under seal February 15, 2013.

[46] Docket no. 254-1, filed March 18, 2013.

[47] *See Zimmerman v. First Fed. Sav. & Loan Ass'n*, 848 F.2d 1047, 1051 (10th Cir. 1988).

[48] *See F.D.I.C. v. United Pacific Ins. Co.*, 20 F.3d 1070, 1079 (10th Cir. 1994) (citations and internal quotation marks omitted).

[49] *Id.* (citations omitted).

[50] Docket no. 242, filed February 14, 2013.

[51] *See id.* at 2.

2002. Plaintiffs' claims against Salt Creek related to the Bonus Agreement therefore fail as a matter of law.

Plaintiffs advance several arguments in support of their claims that Salt Creek was obligated under the Bonus Agreement, even though it was negotiated and reached in August 2002, prior to the sale of Salt Creek, by a party without any relation to Salt Creek at that time. Plaintiffs contend that Indigne had appropriate authority to enter into the Bonus Agreement on behalf of Salt Creek in August 2002, and that even if he lacked the requisite authority, the Bonus Agreement was later ratified by Salt Creek's conduct or by Indigne when he joined Salt Creek's board of directors. Plaintiffs also argue that Salt Creek's company bylaws are not conclusive evidence of the scope of corporate authority. Finally, Plaintiffs argue that Salt Creek is estopped from attacking the Bonus Agreement after it received its benefits. Each of these arguments fails.

A. Indigne Did Not Have Actual Authority.

Indigne lacked actual authority to contract on behalf of Salt Creek in August 2002. "Actual authority incorporates the concepts of express and implied authority."[52] "Express authority exists whenever the principal directly states that its agent has the authority to act on the principal's behalf."[53] "Implied authority, on the other hand, embraces authority to do those acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent."[54] "Analysis of actual authority focuses on the acts of the principal from the agent's perspective."[55]

At trial, no evidence showed that Indigne had either actual express or implied authority to act on behalf of Salt Creek in August 2002. He did not have actual express authority to execute

---

[52] *Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1094 (Utah 1988).

[53] *Id.*

[54] *Id.*

[55] *Diston v. EnviroPak Med. Prods., Inc.*, 893 P.2d 1071, 1076 (Utah Ct. App. 1995).

the Bonus Agreement because in August 2002, Salt Creek had not been sold to the INVE Group and Salt Creek had not taken any action that would lead Indigne to believe that Indigne had *any* authority to contract on its behalf. According to Salt Creek's bylaws and Utah law,[56] only Salt Creek's President, Vice President, or an officer or agent authorized in writing by the board of directors had authority to contract with Cole in August 2002. Indigne did not hold any position with Salt Creek in August 2002 – the INVE Group was only a prospective buyer at that time. In August 2002, Salt Creek's board of directors had not authorized Indigne to act on its behalf.

Plaintiffs argue that Salt Creek did not always follow corporate formalities. However, Cole was not an innocent third party lacking knowledge of Salt Creek's corporate structure or corporate requirements. Cole was president of Salt Creek. He knew the officers and directors of Salt Creek. He had full knowledge that Indigne was not an officer or agent of Salt Creek at the time of the Bonus Agreement. Indigne was in fact adverse to Cole and Salt Creek in the negotiations. Even if Salt Creek failed to follow corporate formalities, Cole's actual knowledge of Indigne's position in relation to Salt Creek in August 2002 vitiates any possibility of Indigne's authority.

Absent actual express authority, implied authority is a legal impossibility. Implied authority is authority that is "incidental to … the main authority expressly delegated to the agent."[57] Implied authority cannot exist without some actual express authority delegated to the agent. In August 2002, Indigne was not an agent of Salt Creek and had no actual express authority to act on its behalf at that time, so it was legally impossible for him to have actual implied authority to enter into the Bonus Agreement on its behalf. Indigne had neither actual express nor implied authority to contract on behalf of Salt Creek in August 2002.

---

[56] Utah Code Ann. § 16-10a-801.

[57] *Posner v. Equity Title Ins. Agency, Inc.*, 2009 UT App 347, ¶ 18, 222 P.3d 775 (citation omitted).

B. <u>Indigne Lacked Apparent Authority to Act on Behalf of Salt Creek.</u>

"Apparent authority is appropriately found where the acts or conduct of the principal …
creates [sic] an appearance which causes a third party to reasonably believe that a second party
has authority to act on the principal's behalf."[58] "[A]nalysis of apparent authority focuses on the
acts of the principal from a third party's perspective."[59]

At trial, Plaintiffs were required to prove by a preponderance of the evidence that Salt
Creek engaged in conduct that led Plaintiffs to understand that Indigne was Salt Creek's agent in
August 2002 when the Bonus Agreement was reached. No evidence at trial was presented to
demonstrate this, and the only evidence presented undermines Plaintiffs' claim that Indigne had
apparent authority to contract on behalf of Salt Creek in August 2002.

Cole's testimony at trial was that he kept the Bonus Agreement a secret and that no one
else at Salt Creek knew about it.[60] If no one else at Salt Creek knew about the Bonus Agreement,
Salt Creek could not have made any affirmative act or conduct that would lead anyone to believe
that Indigne was authorized to enter into the Bonus Agreement on behalf of Salt Creek. Salt
Creek's lack of knowledge of the Bonus Agreement and lack of any affirmative acts signifying
that Indigne was authorized to act on its behalf in August 2002 is fatal to any claim of Indigne's
apparent authority.

Plaintiffs' argument that Indigne had apparent authority fails for several other reasons as
well. First, Cole was not a third party. In August 2002, Cole was president, a director, and a
shareholder of Salt Creek, familiar with the ownership and governance of Salt Creek – he was
not an unaware third party. Second, given Cole's position in and familiarity with Salt Creek, it

---

[58] *Id*. (quotation marks and citations omitted).

[59] *Id.* (quotation marks and citations omitted).

[60] Transcript at 176:8-12, <u>docket no. 238</u>, filed February 5, 2013.

was not reasonable for Cole to believe that Indigne had any authority to act on behalf of Salt Creek in August 2002 prior to its acquisition by the INVE Group. Cole claims that he acted reasonably because he knew that the INVE Group would be acquiring Salt Creek in the future, and that therefore it was reasonable to believe that Indigne had authority to enter into the Bonus Agreement. But Indigne and the INVE Group were only *prospective* buyers of Salt Creek when the Bonus Agreement was reached. If Salt Creek not been sold to the INVE Group there could be no claim that Salt Creek was bound by a Bonus Agreement that was unknown to anyone else at Salt Creek and negotiated by Indigne, who held no position with Salt Creek at the time.

In addition, Plaintiffs' counsel conceded that Indigne lacked the requisite authority to contract on behalf of Salt Creek in August 2002 because the INVE Group did not own Salt Creek at that time.[61] This concession is consistent with the evidence presented at trial, which unequivocally demonstrates that Indigne lacked any authority to contract on behalf of Salt Creek in August 2002.

    C.   The Bonus Agreement was Never Ratified and Salt Creek was Not the Sole Beneficiary of It.

Plaintiffs make several arguments to avoid the effect of Indigne's lack of authority to bind Salt Creek in August 2002. First, they argue that even if Indigne lacked authority in August 2002, Salt Creek subsequently ratified the Bonus Agreement after Salt Creek was sold to the INVE Group. Second, they argue that Salt Creek cannot receive the "benefit of the bargain between Mr. Indigne and Mr. Cole" and later repudiate the obligation to make Bonus Payments by attacking Indigne's authority. Both arguments fail.

At trial, there was no evidence that Salt Creek ratified the Bonus Agreement. Plaintiffs contend that Indigne ratified the Bonus Agreement by facilitating Bonus Payments to

---

[61] Transcript at 318:24-319:3, docket no. 238, filed February 5, 2013.

Plaintiffs.[62] But payments made by INVE Asia, Ltd. cannot constitute ratification by Salt Creek. The undisputed evidence shows that Salt Creek never made a single Bonus Payment (though it did regularly pay Cole's salary for his work with Salt Creek).

Plaintiffs contend that Indigne became a director of Salt Creek on May 1, 2007 and ratified the Bonus Agreement at that time by informing Cole that "Salt Creek would make up past due payments."[63] However, the cited testimony does not support Plaintiffs' assertion.

Plaintiffs' argument that Salt Creek cannot receive the "benefit of the bargain between Mr. Indigne and Mr. Cole" and later repudiate the obligation to make Bonus Payments by attacking Indigne's authority is also unsupported by the evidence. Trial testimony was that Cole's work was not limited to Salt Creek, but included work for other INVE companies, benefitting the entire INVE Group.[64] INVE Asia, Ltd. made the Bonus Payments to Plaintiffs. Salt Creek compensated Cole for his direct work on its behalf by paying him a salary of $150,000 per year.[65] Salt Creek was not the only beneficiary of Cole's work and was not the only payor.

D.  The Integration Clause in the Employment Contract Preempts Salt Creek's Liability Under the Bonus Agreement.

"[W]hen parties have reduced to writing what appears to be a complete and certain agreement, it will be conclusively presumed . . . that the writing contains the whole of the agreement between the parties."[66] Even if Indigne had authority to bind Salt Creek in 2002 and the Bonus Agreement was between Salt Creek and Plaintiffs, the Bonus Agreement would have

---

[62] Memorandum in Opposition to Salt Creek's JNOV Motion at 13, docket no. 253, filed March 18, 2013 (citing Transcript at 108, docket no. 238, filed February 5, 2013).

[63] *Id.*

[64] *See e.g.* Transcript at 119:3-12; 123:20-24; 125:3-7, docket no. 238, filed February 5, 2013.

[65] Transcript at 116:11-17, docket no. 238, filed February 5, 2013.

been nullified the moment Cole signed the employment agreement with Salt Creek on September 26, 2002. The employment agreement's integration clause unequivocally states:

> ENTIRE AGREEMENT. This Employment Agreement contains the entire employment agreement of the parties and there are no other promises or conditions in any other employment agreements whether oral or written. This Employment Agreement supersedes any prior written or oral employment agreements between the parties.[67]

As a matter of law, had the Bonus Agreement, which was agreed to in August 2002, been between Salt Creek and Plaintiffs, it would have been superseded by the Employment Agreement.

For all of the foregoing reasons, Salt Creek's JNOV Motion is granted because Plaintiffs' claims against Salt Creek related to the Bonus Agreement fail as a matter of law.

## III. Salt Creek's Motion for Attorneys' Fees.

"In general, Utah follows the traditional American rule that attorney[s'] fees cannot be recovered by a prevailing party unless a statute or contract authorizes such an award."[68] The employment agreement between Cole and Salt Creek contains a fees provision. It states that "[t]he prevailing party to any litigation brought to enforce this [a]greement shall be awarded attorney's fees."[69]

Salt Creek may recover its attorneys' fees only if it shows that it was the prevailing party in a dispute brought to enforce the employment agreement. The Bonus Agreement document did

---

[67] Employment Agreement, attached as Exhibit B to Salt Creek's JNOV Motion, docket no. 242-2, filed February 14, 2013.

[68] *Hughes v. Cafferty*, 2004 UT 22, ¶ 21, 89 P.3d 148.

[69] Employment Agreement at ¶ 14, attached as Exhibit A to Plaintiffs' Memorandum in Opposition to Defendants' Motion for Award of Attorneys' Fees and Costs, docket no. 241-1, filed February 14, 2013.

not contain an attorneys' fees provision, so the general rule is that Salt Creek may not recover attorneys' fees incurred only for defending against the Bonus Agreement claim.[70]

Plaintiffs' first cause of action in the amended complaint alleges two different breaches of contract, only one of which arose under the employment agreement which contained the attorneys' fees clause. One alleged breach was Salt Creek's alleged failure to pay Bonus Payments under the Bonus Agreement. The second alleged breach was Salt Creek's failure to allow Cole to participate in Salt Creek's 401(k) plan as set forth in the employment agreement (the "401(k) Contract Claim").

Plaintiffs' second cause of action against Salt Creek was also related to the 401(k) plan, but is not a contractual claim. Specifically, Plaintiffs alleged that Salt Creek breached fiduciary duties to Cole under ERISA (the "ERISA Claim") by "terminating [his] participation in [the 401(k) plan], refusing to allow [him] to participate in [the 401(k) plan], and/or wrongfully administering [his] participation in [the 401(k) plan]."[71]

A. 401(k) Contract Claim Fails.

Prior to trial, Salt Creek filed a motion in limine to exclude evidence and testimony related to Cole's 401(k) Contract Claim,[72] arguing that the claim arose after the employment agreement expired and that it was preempted by ERISA. Cole opposed Salt Creek's motion, contending that the employment agreement continued after its stated expiration date and that his

---

[70] *Foote v. Clark*, 962 P.2d 52, 55 (Utah 1998).

[71] Plaintiffs' First Amended Complaint at 6, ¶ 31, docket no. 38, filed August 5, 2010.

[72] Salt Creek, Inc.'s Motion in Limine to Exclude Evidence and Testimony by Plaintiffs of any Breach of Contract Relating to Cole's Participation in the ERISA Plan, docket no. 170, filed under seal December 14, 2012.

common law contract claim (as set forth in the first cause of action) did not relate to ERISA and therefore was not preempted.[73]

As pled in the first amended complaint,[74] Cole's 401(k) Contract Claim and his ERISA Claim were distinct. The first cause of action in Plaintiffs' first amended complaint alleges that "Defendants breached the [e]mployment [a]greement by preventing Cole from participating in Defendants' 401(k) plan…"[75] and that as a result of this alleged breach, "Cole [was] entitled to a reasonable attorneys' fee."[76] This is a contractual claim. In contrast, Cole's ERISA Claim under the second cause of action alleged that "Cole was owed a fiduciary duty by Defendants with regard to his participation in, and subsequent termination from, [the 401(k) plan]"[77] and that Defendants breached their fiduciary duties by "terminating [his] participation in [the 401(k) plan], refusing to allow [him] to participate in [the 401(k) plan], and/or wrongfully administering [his] participation in [the 401(k) plan]."[78]

On January 3, 2013, Salt Creek's motion in limine was granted because the 401(k) Contract Claim was only pled as arising under the employment agreement.[79] Because the employment agreement was terminated before he was barred from the 401(k) plan, there was no viable cause of action. Thereafter, as acknowledged by Cole,[80] his only remaining claim related to the 401(k) plan was his statutory ERISA Claim which settled during trial.

---

[73] Cole's Memorandum in Opposition to Motion in Limine to Exclude Evidence and Testimony by Plaintiffs of Any Breach of Contract Relating to Cole's Participation in the ERISA Plan at 2 (misnumbered as p. 2), docket no. 182, filed December 21, 2012.

[74] Docket no. 38, filed August 5, 2010.

[75] *Id.* at ¶ 24.

[76] *Id.* at ¶ 27.

[77] *Id.* at ¶ 30.

[78] *Id.* at ¶ 31.

[79] Sealed Minute Entry, docket no. 203, entered January 3, 2013.

[80] *Id.*

B.  Entitlement to Attorneys' Fees.

Salt Creek – and all the other Defendants – prevailed against Plaintiffs on the 401(k) Contract Claim. Because the 401(k) Contract Claim arose under the employment agreement, Defendants are entitled to their attorneys' fees related to defending against that claim.[81] And generally, because a party cannot be awarded fees under a contract if the fees were incurred in "unsuccessful claims for which there would have been an entitlement to attorney fees had the claims been successful, [or] claims for which there is no entitlement to attorney fees,"[82] Defendants would not be entitled to their fees incurred in defending against the Bonus Payment claims or the statutory ERISA Claim as those claims did not arise out of the employment agreement.

But another rule also applies. A broad view is needed in cases in which "claims . . . are based on related legal theories and a common core of facts."[83] In those cases, "the district court must focus on the significance of the overall relief obtained in relation to the hours reasonably expended on the litigation."[84]

Plaintiffs' 401(k) Contract Claim was factually intertwined with their ERISA Claim and their Bonus Agreement claims. Throughout this litigation, Plaintiffs argued that the Bonus Payments were part of Cole's compensation from Salt Creek and that Salt Creek is liable for those Bonus Payments. Plaintiffs' ERISA Claim and their 401(k) Contract Claim both arose from Salt Creek's 401(k) plan and its administration, and Cole's original participation in the plan came because of the employment agreement. Plaintiffs' contract claims and ERISA Claim involved

---

[81] *See Hooban v. Unicity Int'l, Inc.*, 2012 UT 40, ¶ 29, 285 P.3d 766 (holding that even extra-contractual parties are entitled to an award of attorneys' fees if they successfully defend against a suit arising under a contract containing an attorneys' fees provision).

[82] *Foote v. Clark*, 962 P.2d 52, 55 (Utah 1998) (quotation marks and citation omitted).

[83] *Harvey Barnett, Inc. v. Shidler*, 200 Fed. Appx. 734, 747 (10th Cir. 2006) (citations omitted) (unpublished).

[84] *Id.*

similar legal theories and underlying facts. The same core pool of witnesses was involved on all the claims. Defendants correctly state "the discovery and briefing concerning both breach of contract claims focused on the same issues, such as the nature of Cole's employment, the terms of his employment, negotiations concerning the term of his employment, and whether he fully performed his contractual employment duties."[85]

But the claims were not identical. Plaintiffs' Bonus Agreement claims raised issues of corporate formalities, party liability, agency relationships, and authority, among others. The 401(k) Contract Claim did not involve these issues. While Defendants did not segregate that work in their itemization of fees, the court is familiar with the effort devoted exclusively to those issues and estimates it at no more than 15% of the case work.

Defendants faced significant monetary demands. Plaintiffs' initial demand for all sums due was "well over" $1.75 million dollars,[86] and in their first amended complaint, they sought $1.25 million plus their attorneys' fees.[87]

C.  Amount of Award.

Defendants claim that they are entitled to an award of fees and costs in the amount of $330,763.50.[88] This amount includes the expert witness fees of J. Walden Lloyd totaling $17,011.25.[89]  He provided advice and consultation related to the ERISA Claim and the 401(k) Contract Claim. The sum claimed does not include fees related to unsuccessful motions, fees for which Plaintiffs objected, or fees related to any work after the date the 401(k) Contract Claim was effectively dismissed, except for fees incurred in filing this Motion.

---

[85] Defendants' Reply in Support of Motion for Award of Attorneys' Fees and Costs at 10, docket no. 248, filed March 4, 2013.

[86] Docket no. 248-2, filed March 4, 2013.

[87] Docket no. 138, filed August 5, 2010.

[88] Amended Declaration of Attorneys' Fees and Costs at 3-4, docket no. 248-3, filed March 4, 2013.

[89] Amended Declaration of Attorneys' Fees and Costs, Exhibit C-2, docket no. 248-5, filed March 4, 2013.

In determining the reasonableness of Defendants' counsel's fees, the following factors were considered: Defendants' counsel's experience, reputation and ability; the time and effort required to obtain a favorable outcome for Defendants; the novelty and difficulty of the issues in this case; and the skill required to perform the legal services properly and to assist the court in reaching a sound result.[90] The approximately 1,038 hours counsel for Defendants spent working on the intertwined and substantially related claims in this case, excluding time spent during trial or on unsuccessful motions, was reasonably necessary to defend against Plaintiffs' claims. The hourly billing rates charged by counsel for Defendants are consistent with billable rates of other attorneys in the Salt Lake City area with similar experience.

The "focus on the significance of the overall relief obtained by the [prevailing party] in relation to the hours reasonably expended on the litigation"[91] shows Defendants prevailed on virtually all of the claims asserted by Plaintiffs. The overall relief was in favor of Defendants and against Plaintiffs. The only claim on which Plaintiffs succeeded was the ERISA Claim, which settled during trial. And that claim was very closely related to and intertwined with the 401(k) Contract Claim.

---

[90] *See Dixie State Bank v. Bracken*, 764 P.2d 985, 989-90 (Utah 1988) (footnotes omitted) (referencing the factors set forth in Rule 1.5(a) of the Utah Rules of Professional Conduct as relevant to the reasonableness determination: (a) a lawyer shall not make an agreement for, charge or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:
    (a)(1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly;
    (a)(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
    (a)(3) the fee customarily charged in the locality for similar legal services;
    (a)(4) the amount involved and the results obtained;
    (a)(5) the time limitations imposed by the client or by the circumstances;
    (a)(6) the nature and length of the professional relationship with the client;
    (a)(7) the experience, reputation and ability of the lawyer or lawyers performing the services; and
    (a)(8) whether the fee is fixed or contingent.)

[91] *Harvey Barnett*, 200 Fed. Appx. at 748.

Considering the relative size, complexity, and intertwined nature of the claims, along with the overall success obtained by Defendants, and the reasonableness of the hours and fees for which compensation is claimed, and making an allowance for the legal issues unique to the Bonus Agreement claim, Defendants are awarded 85% of their attorneys' fees and costs – and all of J. Walden Lloyd's expert witness fees[92] – in the total amount of $283,700.66.

## ORDER

IT IS HEREBY ORDERED that Plaintiffs' Motion to Alter or Amend Judgment, or in the Alternative, for New Trial on the Issues of Breach of Contract and Damages[93] is DENIED.

IT IS FURTHER ORDERED that Defendants' Renewed Motion for Judgment as a Matter of Law[94] is GRANTED.

IT IS FURTHER ORDERED that Defendants' Motion for Award of Attorneys' Fees and Costs is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs shall pay Defendants attorneys' fees and costs in the amount of $283,700.66.

Dated April 28, 2014.

BY THE COURT:

David Nuffer
United States District Judge

---

[92] *See Storagecraft Tech. Corp. v. Kirby*, No. 2:08-cv-921-DN, 2012 WL 4467520 (D. Utah Sept. 27, 2012) (unpublished).

[93] Docket no. 243, filed February 15, 2013.

[94] Docket no. 242, filed February 14, 2013.